394 A.2d 419

**In re "B".**

**Appeal of Dr. Loren ROTH.**

Supreme Court of Pennsylvania.

Argued March 13, 1978.
Decided Oct. 5, 1978.
Reargument Denied Nov. 8, 1978.

1. The weapons offense was appealed to Superior Court, which certified the appeal to this court.

474

Wilbur McCoy Otto, Stewart M. Flam, Dickie, McCamey & Chilcote, Alan Meisel, Pittsburgh, Joel I. Klein, Mental Health Law Project, Washington, D. C., for appellant.

Alexander J. Jaffurs, County Sol., Douglas T. Greene, Asst. County Sol., for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION

MANDERINO, Justice.

This appeal is from the April 26, 1976, order of the Court of Common Pleas of Allegheny County, Family Division,

Juvenile Section, holding appellant, Dr. Loren Roth, in contempt. The circumstances surrounding the contempt citation occurred during the dispositional phase of a juvenile delinquency proceeding. A thirteen-year-old boy named "B" was adjudicated a delinquent after he escaped from a juvenile facility and participated in a theft of four automobiles. As part of the court's efforts to determine proper placement for the juvenile, both "B" and his mother were interviewed by various juvenile court personnel. In the course of these interviews it was learned that "B's" mother had received inpatient psychiatric treatment at the University of Pittsburgh, Western Psychiatric Institute and Clinic (WPIC), on four occasions between 1964 and 1974. Based upon this information, the juvenile court's psychiatrist, who had examined both "B" and his mother, recommended ". . . getting the hospital records regarding "B's" mother and her treatment." In response to this recommendation, the juvenile court judge wrote to WPIC requesting release of "B's" mother's psychiatric records. When informed by WPIC that the records would not be released without the patient's consent, the court issued a subpoena to the Administrator of WPIC ordering him to attend a hearing on April 26, 1976, and to bring "B's" mother's records with him. On April 26, 1976, Dr. Roth attended the hearing on behalf of the director of WPIC, and although he had brought the appropriate documents with him, refused to release them to the Court without the patient's consent. Dr. Roth was then adjudged in contempt of court and fined $100.00. Execution of the court's order was stayed pending appeal.

Subsequently, the Juvenile Court issued a written opinion stating that Dr. Roth had been held in "direct civil contempt" for his refusal to obey the subpoena. Appeal was taken to the Superior Court. Although the contempt citation was labeled "civil contempt" by the judge, the Superior Court found that ". . . no standards were attached to the sanction by which appellant could purge himself of his contempt . . . ," that the dominant purpose of the contempt order was punitive in nature, and that therefore,

the contempt was criminal. *In re B*, 247 Pa.Super. 395, 372 A.2d 884 (1977). Having concluded that the contempt was criminal rather than civil, the Superior Court ordered Dr. Roth's appeal transferred to us. *Id.* This appeal followed.

Initially, we note our agreement with the Superior Court that exclusive jurisdiction over this appeal is vested in us by the Act of July 31, 1970, P.L. 673, No. 223, Art. II, § 202(5). 17 P.S. § 211.202(5) (Supp.1978). Although the Juvenile Court characterized its contempt citation as "civil," that classification is not determinative. *Woods v. Dunlop*, 461 Pa. 35, 334 A.2d 619 (1975). We said in *In Re Martorano*, 464 Pa. 66, 77, 346 A.2d 22, 27–28 (1975):

> "There is nothing inherent in a contemptuous act or refusal to act which classified that act as 'criminal' or 'civil.' The distinction between criminal and civil contempt is . . . a distinction between two permissible judicial responses to contumacious behavior.
>
> .        .        .        .        .
>
> These judicial responses are classified according to the dominant purpose of the court."

As we said in *Commonwealth v. Charlett*, 481 Pa. 22, 391 A.2d 1296 (1978), quoting from *Woods v. Dunlop, supra*, 461 Pa. at 40, n. 2, 334 A.2d at 622, n. 2:

> "Discovery of the Court's dominant purpose requires a functional analysis of the court's action. . . . Basically, the reviewing court must decide whether the citing court's purpose was to 'vindicate the dignity and authority of the court and to protect the interest of the general public.' Such citation is for criminal contempt. If the citation's purpose is to coerce the contemnor into compliance with the order of the court to do or refrain from doing some act primarily for the benefit of a litigant or a private interest the citation is for civil contempt." (citations omitted).

Clearly, the dominant purpose behind the court's contempt order was to vindicate the court's authority by punishing appellant for his refusal to obey the court's order.

Immediately following his refusal to give the hospital records to the court, appellant was adjudged in contempt and a fine of $100.00 was assessed. No conditions or standards were attached which would have allowed appellant to purge himself of his contempt by compliance with the court's order. Appellant was thus powerless to escape by compliance. Thus, the contempt was criminal in nature and the appeal properly lies with us. We therefore address the merits of the controversy.

Appellant's argument is two-fold. He first argues that a patient's psychiatric records are privileged from judicial disclosure in a juvenile delinquency proceeding by the so-called doctor-patient privilege statute. He also contends that the patient's constitutional right of privacy prevents disclosure of information obtained by the doctor within the confines of the doctor-patient relationship. Ordinarily, when faced with an issue raising both constitutional and non-constitutional questions, we will make a determination on non-constitutional grounds, and avoid the constitutional question if possible. *Commonwealth v. Staley*, 476 Pa. 171, 381 A.2d 1280 (1978). We conclude that the doctor-privilege statute does not prohibit disclosure of the records in this case, but that their disclosure is barred by the patient's constitutionally protected right of privacy. We will therefore discuss both the constitutional and the non-constitutional questions raised.

The doctor-patient privilege statute, Act of June 7, 1907, P.L. No. 462, as amended, 28 P.S. § 328, provides:

"No person authorized to practice physics or surgery shall be allowed, in any civil case, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil cases, brought by such patient, for damages on account of personal injuries."

In ruling that the privilege created by this statute did not apply in the present context, the juvenile court relied on

three different grounds: (1) that the records were not
"communications," (2) that disclosure of the records would
not "tend to blacken" "B's" mother's character, and (3) that
general considerations of public policy, particularly the need
for the court to assure proper placement of a juvenile
adjudicated delinquent, mandated disclosure of the psychiat-
ric records.

Pennsylvania appellate courts have had little occasion to
consider the parameters of the privilege statute. Although
the statute's prohibition speaks in terms of ". . . *any
information . . .* acquired in attending the patient,"
(emphasis added) this Court, when first called upon to con-
strue the statute, in *In re Phillips' Estate*, 295 Pa. 349, 145
A. 437 (1929), limited the prohibition to "communications"
received from the patient, and held that the act does not
prevent disclosure of information learned by a doctor
through examination or observation. *See also, Panko v.
Consolidated Mutual Insurance Co.*, 423 F.2d 41 (3d Cir.
1970) (Pennsylvania privilege statute applies only to commu-
nications and not to information acquired by physical exami-
nation); and *Woods v. National Life and Accident Insurance
Co.*, 347 F.2d 760 (3d Cir. 1965) (Pennsylvania privilege
statute applies only to patient's communications which tend
to blacken patient's character). This distinction between
"communications" and "examinations" established by *Phil-
lips' Estate*, is said to be based upon the purpose of the
privilege statute, namely, to create a confidential atmo-
sphere in which the patient will be encouraged to disclose all
possible information bearing on his or her illness so that the
physician may render effective treatment. The statutory
privilege need not apply to information learned by the
doctor through observation and examination because confi-
dentiality presumably is not required for the doctor to
observe and examine but confidentiality is essential if the
doctor's information is to be obtained from the patient's
communications.

Nevertheless, appellant argues that the statute should bar
testimony of a psychotherapist because, in psychotherapy,

most if not all information is obtained from "communications" of the patient.

"In psychotherapy, however, every statement is a link in the chain. Thus all statements are relevant to treatment, and require confidentiality. All physicians may discuss matters with their patients which have no relevance to the illness, but in psychotherapy, almost all, if not all, statements are pertinent to and essential for treatment." Slovenko, *Psychotherapy, Confidentiality and Privileged Communications* 44 (1966).

To support this proposition, appellant relies on the Superior Court's decision in *Commonwealth ex rel. Romanowicz v. Romanowicz,* 213 Pa.Super. 382, 248 A.2d 238 (1968). In that case the court held in part, that *all* testimony regarding a psychiatrist's examination of the patient was properly excluded in a child custody dispute. As stated by the Superior Court

"There is nothing in the record . . . which would reflect that the parties ever considered [a stipulation entered by the husband and wife] an agreement to waive the physician-patient privilege. Under such circumstances, the husband could properly invoke the privilege and refuse to have the psychiatrist testify as to the husband's *examination*." (Emphasis added.)

*Id.,* 213 Pa.Super. at 386, 248 A.2d at 240.

The court's opinion in *Romanowicz* does not make clear whether the proposed psychiatric testimony was obtained solely through "observation" of the husband, or whether the psychiatrist's "examination" consisted of conversations with the patient so as to make it "communication" as required by *Phillips' Estate,* where we said,

"[t]hat which results from an examination only cannot be communications made to the doctor by the patient."

295 Pa. at 353, 145 A. at 438.

Although *Romanowicz* is distinguishable from *Phillips' Estate* in that the "examination" in the latter case apparently resulted from physical observations only while the "examination" in *Romanowicz* probably included both physical ob-

servation and "communication," no explanation is given by the Superior Court for its conclusion that the privilege statute prohibits the disclosure of information obtained through psychiatric examination even though it does not prohibit disclosure of information obtained through physical examination.

Moreover, the Superior Court's opinion in *Romanowicz* makes no mention of the statute's requirement that to be privileged, the information sought from the doctor must ". . . tend to blacken" the patient's character. Regarding this statutory directive, the court in *Skruch v. Metropolitan Life Insurance Co.*, 284 Pa. 299, 131 A. 186 (1925), concluded that the act's prohibition applies only to "communications" received from the patient which indicate that the patient was suffering from some "loathsome disease." *Id.*

Based on *Skruch,* appellee argues that any ailment or condition short of a "loathsome disease" fails to meet the statutory requirement that, to be privileged, its disclosure must tend to blacken the patient's character. Of course, what may have been defined as a "loathsome disease" in 1925, when *Skruch* was decided, may not remain so today. Whatever the meaning of "loathsome disease," psychiatric treatment does not evidence the existence of such a condition.

The record in this case is devoid of any information indicating whether the records sought by the court contained "communications" or whether the records consisted entirely of "observations" of examining psychiatrists at WPIC. Although we recognize the accuracy of Prof. Slovenko's observations, supra, that most, if not all, psychotherapeutic examinations are performed through "communication" with the patient, it does not necessarily follow that the records made as a result of those examinations also contain the patient's communications. Furthermore, we are unable to conclude that outside knowledge that a person has undergone psychotherapeutic treatment will ". . . tend to blacken" the person's reputation. *See Soltaniuk v. Metro-*

*politan Life Insurance Co.,* 133 Pa.Super. 139, 2 A.2d 501
(1938) (information that patient suffered from chronic alco-
holism and delirium tremens was not information which
tended to blacken character of patient so as to be subject of
statutory privilege); *Sweeney v. Green,* 116 Pa.Super. 190,
176 A. 849 (1935) (fact of consultation with physician is not
privileged).

For these reasons, we cannot conclude that the privi-
lege statute prohibits testimony such as was sought from
appellant in this case. Our analysis, however, is not yet at
an end, for as appellant argues, the Juvenile Court's order
that appellant reveal what he learned in the course of
professional treatment of a patient also touches upon the
right of privacy protected by both the federal constitution,
and by the constitution of this Commonwealth.

While no specific guarantee of a right of privacy is to
be found in the Constitution of the United States, the U. S.
Supreme Court has said that zones of privacy are created by
the more specific constitutional guarantees, and governmen-
tal intrusion into these zones is thereby limited. *See, e. g.,
Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405
(1976); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d
147 (1973). This right of privacy is a fundamental one, said
to be a right older even than the Bill of Rights, *Roe v. Wade,
supra; Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678,
14 L.Ed.2d 510 (1965). *See also Kewanee Oil Co. v. Bicron
Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974);
*Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d
797 (1974); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029,
31 L.Ed.2d 349 (1972); *Stanley v. Georgia,* 394 U.S. 557, 89
S.Ct. 1243, 22 L.Ed.2d 542 (1969). As stated by Mr. Justice
Douglas in his dissenting opinion in *Poe v. Ullman,* 367 U.S.
497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the constitutionally
protected right of privacy emanates from the totality of the
constitutional scheme under which we live. Also, it has been
said that the roots of the right may be found in the penum-
bra of various specific constitutional provisions such as the
First Amendment's guarantee of freedom of speech and

press *see, e. g., Roe v. Wade, supra; Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Stanley v. Georgia, supra;* and of freedom of association *see, e. g., NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); the Third Amendment's prohibition against the peacetime quartering of soldiers in any house without the consent of the owner *see, e. g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Griswold v. Connecticut, supra; Poe v. Ullman, supra,* (dissenting opinion of Harlan, J.); the Fourth Amendment's prohibition of unreasonable searches and seizures *see, e. g., Roe v. Wade, supra; Griswold v. Connecticut, supra;* the Fifth Amendment's privilege against self-incrimination, *see e. g., Roe v. Wade, supra; Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1062, 16 L.Ed.2d 694 (1966); *Griswold v. Connecticut, supra; Murphy v. Waterfront Com. of New York Harbor,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); and the Ninth Amendment's reservation to the people of rights not expressly enumerated in the Constitution, *see, e. g., Griswold v. Connecticut, supra; Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■ The right of privacy derived from these constitutional underpinnings protects the privacy of intimate relationships like those existing in the family, marriage, motherhood, procreation, and child rearing. *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). As such, the protection extends not only to the home, *Stanley v. Georgia, supra,* but also to the doctor's office, the hospital, the hotel room, or as is otherwise required to safeguard the right to privacy involved in such intimate relationships. *Paris Adult Theatre I v. Slaton, supra.*

The parties in this appeal have not cited, and our research has not revealed, any Pennsylvania appellate court decision dealing explicitly with this constitutional right of privacy. The general right of privacy, however, has been recognized by Pennsylvania courts as an independent and distinct legal concept in the field of tort law. *See, Bennett v. Norban,* 396 Pa. 94, 151 A.2d 476 (1959); *Mack Appeal,* 386 Pa. 251, 126

A.2d 679 (1956). Indeed, in *Mack Appeal,* the court may implicitly have anticipated the reasoning of the later United States Supreme Court cases cited above. *Mack* dealt with an appeal from a contempt citation entered against various defendant news reporters who had surreptitiously photographed the defendant during a criminal trial in violation of a local rule of court. Addressing the issue of whether the local rule prohibiting the taking of photographs during court sessions violated the reporter's federal and state constitutional right to freedom of the press, the court noted that at least one of the rule's purposes was to insure the right of privacy of those on trial:

"The [reporters] also violated the rules of court of Westmoreland County, which were made to insure the right of privacy of the defendant. There can be no question that American jurisprudence recognizes the right of privacy; the only question being its limits. See 'The Right to Privacy,' by Samuel D. Warren and Louis D. Brandeis, 4 Harvard Law Review, 193. As stated in 77 C.J.S. Right of Privacy, at page 397, in some, but not in all, jurisdictions the existence of such right has been recognized, even in the absence of statutory regulation. In this jurisdiction we find no basis for denying the existence of such right or its enforceability. See the excellent opinion of Judge Allessandroni in *Clayman v. Bernstein,* 38 D. & C. 543, and cf. *Harlow v. Buno Co., Inc.,* 36 Pa.Dist. & Co.R. 101. See also *Waring v. WDAS Broadcasting Station, Inc.,* 327 Pa. 433, 194 A. 631, and particularly the concurring opinion of Justice Maxey appearing at page 456, of 327 Pa. at page 642 of 194 A.; and Restatement, Torts, § 867.

The court below, as are all courts, was charged with a duty to protect the right of privacy of the prisoner. It cannot be doubted that the prisoner was powerless to do so by any means within his control; and in such case the court has an inherent duty to use all reasonable means to safeguard that right. It is true that, in a sense, the prisoner has been set apart from the general public and

has become a 'public figure.' Yet he is the involuntary subject of court restraint and entitled to the safeguard of his individual right of privacy, just as the court is charged with securing to him his right of a fair trial and other rights too numerous to mention. In this case the defendant was found guilty of murder in the first degree by verdict of the jury, but at the same time he was a ward of the court who must be protected against the invasion of his rights by the press as well as the public."

386 Pa. at 259–260; 126 A.2d at 682–683.

We conclude that in Pennsylvania, an individual's interest in preventing the disclosure of information revealed in the context of a psychotherapist-patient relationship has deeper roots than the Pennsylvania doctor-patient privilege statute, and that the patient's right to prevent disclosure of such information is constitutionally based. This constitutional foundation emanates from the penumbras of the various guarantees of the Bill of Rights, *Griswold v. Connecticut, supra,* as well as from the guarantees of the Constitution of this Commonwealth, see especially, Article I, Section 1 (inherent right to enjoy and defend life and liberty, to protect reputation and pursue happiness); Article I, Section 2 (all political power is inherent in the people); Article I, Sections 3 and 4 (people's right to freedom of religion); Article I, Section 7 (freedom of press and speech guaranteed to every citizen so that they may speak, write, or print freely on any subject ". . . being responsible for the abuse of that liberty."); Article I, Section 8 (people shall be secure in their persons, houses, papers, and possessions from unreasonable search and seizures); Article I, Section 9 (an accused in a criminal proceeding cannot be compelled to give evidence against himself); Article I, Section 11 (courts are to be open to all to provide remedy for injury done to reputation); Article I, Section 20 (right of assembly); Article I, Section 23 (prohibition of the peacetime quartering of troops in any house without the consent of the owner); and Article I, Section 25 (reservation of powers in the people); and Article I, Section 26 (prohibition against the denial by

the Commonwealth of the enjoyment of any civil right). In some respects these state constitutional rights parallel those of the Federal Constitution, see especially, Amendments 1, 3, 4, 5, and 9. In other respects our Constitution provides more rigorous and explicit protection for a person's right of privacy e. g., Article I, Sections 1, 3, 4, 7 and 11.

The nature of the psychotherapeutic process is such that disclosure to the therapist of the patient's most intimate emotions, fears, and fantasies is required. As pointed out in appellant's brief,

> "People usually enter psychotherapy because they have deep-seated conflicts and impairment of functioning which limit their ability to work effectively and to enjoy fully satisfying relationships with other people. To alleviate these blocks and conflicts, the therapist asks the patient to abandon 'rational thought' and to express thoughts and fears that may never have been revealed to anyone else. Indeed, these innermost thoughts are often so painful, embarrassing or shameful that the patient may never before have allowed himself to acknowledge them."

The patient in psychotherapy knows that such revelations will be expected if the process is to be beneficial. In laying bare one's entire self, however, the patient rightfully expects that such revelations will remain a matter of confidentiality exclusively between patient and therapist. *See, Caesar v. Mountanos*, 542 F.2d 1064 (9th Cir. 1976); *In re Lifschutz*, 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1 (1970).

The record in the instant case reveals that the patient's hospital records were subpoenaed so that they could be evaluated by the juvenile court judge, the court's staff psychologist, staff psychiatrist, and staff social workers, so that they might assist the court in determining who should have custody over the patient's delinquent son. More specifically, according to the record of the hearing held pursuant to the subpoena of the hospital records regarding Mrs. B, these records were sought so that the juvenile court could decide whether or not to allow Mrs. "B's" delinquent son to

return home to live with her. The court, based on the recommendation of its staff psychologist, felt that much of the juvenile's psychiatric history could be explained by the mother's history. We applaud the court's concern about proper placement for a juvenile; the court's efforts to place the child with one of his parents are commendable.

We recognize that our holding may, in some cases, make it more difficult for the court to obtain all the information it might desire regarding members of the juvenile's family, or about the juvenile's friends, neighbors, and associates. The individual's right of privacy, however, must prevail in this situation. Moreover, much, if not all, of the information sought by the juvenile court might have been obtained without ordering disclosure of materials revealed within the private confines of the mother's constitutionally protected doctor-patient relationship. The mother might have voluntarily submitted to psychiatric examination by a court-appointed psychiatric expert who could evaluate her ability to provide a proper home for her child, or who could, based on the findings of such examination, recommend appropriate alternative placement. Neither the doctor-patient privilege created by statute, nor the constitutionally protected zone of privacy would bar such an evaluation because the mother would not be relying detrimentally on either the doctor-patient privilege or upon her right of privacy *if she chose to submit* to such an evaluation. *Cf. Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In this way, the juvenile court could accommodate its legitimate interest in assuring proper placement of the juvenile while at the same time preserving other important social interests.

For these reasons, we hold that the court below was without authority to order appellant to reveal information obtained within the context of a psychotherapist-patient relationship. Accordingly, the court was without authority to hold appellant in contempt for refusing to divulge such information.

Order reversed.

ROBERTS, J., filed a concurring opinion.

O'BRIEN, J., concurred in the result.

EAGEN, C. J., filed a dissenting opinion.

POMEROY, J., filed a dissenting opinion in which Mr. Justice NIX joined.

ROBERTS, Justice, concurring.

The opinion of Mr. Justice Manderino is mistaken in its view that the legislatively-created doctor-patient privilege [1] is insufficient to protect hospital records based on confidential communications from a psychiatric patient to her attending physician(s), and that therefore such protection must be found under the Federal and Pennsylvania Constitutions. In my view the records are privileged under the Act of 1907, and therefore I find it unnecessary to reach any constitutional question.

# I

Dr. Loren Roth appeals from an order of the Family Court Division of the Court of Common Pleas of Allegheny County holding him in contempt. The Administrator of the Western Pennsylvania Institute and Clinic (WPIC) was ordered to appeal at a hearing on April 26, 1976 and to produce WPIC's medical records of Mrs. B, one of its patients. Dr. Roth, representing the Director of WPIC, appeared at the hearing, but refused to release Mrs. B's records because he did not have Mrs. B's consent. Since the opinion of Mr. Justice Manderino concludes that there was no statutory privilege protecting these psychiatric records, it holds the absence of patient consent a defense to the court's order only if the records are constitutionally protected.

---

1. Act of June 7, 1907, P.L. 462 § 1, 28 Pa. § 328:

"Physicians and surgeons not to disclose information; exception
No person authorized to practice physics or surgery shall be allowed, in any civil case, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil cases, brought by such patient, for damages on account of personal injuries."

The family court sought the psychiatric records of Mrs. B, to aid in its resolution of the custody of her delinquent son, B. In an effort to retain custody of her son, Mrs. B was willing to and did undergo examination by the juvenile court's psychiatrist. Indeed, it was in the course of this psychiatric examination that the court's psychiatrist learned of the existence of these records. Mrs. B did not object in any way to the introduction into evidence of the results of the court-directed psychiatric examination. She did not consent, however, to the release of WPIC's psychiatric records of her four inpatient treatments. ·

## II

The court of common pleas concluded that even if these records were protected by the Act of 1907, general considerations of public policy, particularly the need for the court to assure proper placement of a juvenile adjudicated delinquent, mandated disclosure of the psychiatric records. This determination of the trial court is in error. The Legislature, sensitive to the very public policy interests here present, has already protected those interests by granting the juvenile judge the power to determine who shall have custody of the delinquent child and to conduct hearings and request examinations pursuant to the exercise of that power. Act of December 6, 1972, P.L. 1464, No. 333, §§ 22–23, as amended, Act of August 3, 1977, P.L. 155, No. 41 § 1, 11 P.S. § 50–319–20.

The public policy interest adduced by the juvenile court cannot justify abrogation of a legislatively created privilege when there is clearly available an alternative means of vindicating that interest, and where, as here, it is completely unobjectionable to the protected party. Mrs. B's demonstrated willingness to submit to psychiatric examinations by the family court's psychiatrist vindicates the public interest the family court sought to protect. There is no reason, therefore, on the facts of this case, to disturb the balance struck by the Legislature. The relevant and probative material required by the court was available from legislatively unprotected sources.

## III

The statutory holding in Mr. Justice Manderino's opinion does not address the scope of effect of the "Act relating to the practice of psychology," Act of March 23, 1972, P.L. 136, No. 52, 63 P.S. § 1213. Section 13 of that Act provides:

"Privileged communications

A person licensed as a psychologist under the provisions of this act cannot, without the written consent of his client, be examined in a civil or criminal action as to any information acquired in the course of his professional services in behalf of the client. The confidential relations and communication between a psychologist and his client are on the same basis as those provided by law between an attorney and client, and nothing in this act shall be construed to require any such privileged communication to be disclosed." Id.

Although this statute does not expressly apply to medical doctors engaged in the practice of psychotherapy, but rather only to those with graduate degrees in psychology, see id., § 6, 63 P.S. § 1206, it would be arbitrary to believe that the Legislature intended the scope of a patient's privilege to depend on whether the attending therapist is a medical doctor or a psychologist. Rather, it is clear the Legislature meant to extend to patients of psychologists the same privilege it believed already existed between patient and psychiatrist. There is certainly no less need for confidentiality where psychiatric therapy is conducted by a physician. At the very least, this Court should use this Act as a guide to interpreting the Act of 1907. We note, in particular, that the clear concern in the Act for fostering a free flow of communication between patient and therapist is manifested in the provision that the privilege extend to criminal as well as civil litigation "on the same basis as [is] provided by law between an attorney and client."[2]

2. Alternatively, given the view expressed in the opinion of Mr. Justice Manderino that the Act of 1907 does not protect the psychotherapeutic relation where the therapist is a medical doctor, there is

IV

The analysis of the Act of 1907 given by Mr. Justice Manderino relies primarily on our 1929 case *In Re Phillips Estate*, 295 Pa. 349, 145 A. 437, in which we held the Act did not protect the results of a physical examination by a medical doctor. I do not disagree that *Phillips* created a distinction between observations or examinations and communications or with the conclusion that, because none of the statutes purposes would be served, "the statutory privilege need not apply to information learned by the doctor through observation and examination." P. 422.

I must disagree, however, when the opinion proceeds to the conclusion that even though, "most, if not all psychotherapeutic examinations are performed through 'communication' with the patient, it does not necessarily follow that the records made as a result of those examinations also contained the patient's communications," p. 423, and that therefore these records are not privileged. I would read *Phillips* for the simple and uncontroverted principle that where there is no question of a doctor's diagnosis or treatment being dependent on the patient's communicating with the doctor about his condition, a doctor is incompetent to testify as to the results of his physical examinations, diagnosis and treatment, and records of such results may be suppressed.

The opinion of Mr. Justice Manderino cites no authority for the proposition that a patient can properly invoke the statutory privilege only when her "words" will be made public.³ And *Phillips* does not support this conclusion.

no bar to finding such protection under the common law, especially where, as here, the Legislature has made manifest the commitment of the Legislature to protecting this relationship and there is no rational basis on which to distinguish forms of protection. See generally, W. Schaefer, "Precedent and Policy," 34 U.Chi.L.Rev. 3 (1966).

3. The only case which the Commonwealth raises which supports its position and that of Mr. Justice Manderino is *Commonwealth ex rel. Beemer v. Beemer*, 9 Leb. Co. 26, appeal quashed 200 Pa.Super. 103, 188 A.2d 475. Appellee argues that, although it cannot be deter-

The issue in *Phillips* was whether a doctor was competent to testify as to his decedent patient's paretic condition. It was the doctor's view that paresis could only be caused by syphilis. Because disclosure of the fact (of paresis and its cause) would tend to blacken decedent's character, the trial judge excluded the medical testimony as to decedent's condition from consideration, relying on the Act of 1907. We reversed the trial court's determination that the Act of 1907 protected this material from entering the record.

It is clear, however, that the diagnosis of paresis in *Phillips* in no way depended on communications from the patient to the attending physicians. Thus, since the disputed testimony went to an apparent condition and since diagnosis and treatment in no way depended on the free flow of communication between patient and doctor in an atmosphere of confidentiality, we held the privilege inapplicable. And therefore the fact that the medical opinion would have tended to blacken decedent's character was irrelevant to a determination of the doctors' competency as witnesses, or the admissibility of their testimony about her paretic condition.

The *Phillips* court properly limited the scope of the privilege to those situations which involved the diagnosis and treatment of conditions which could not proceed in the absence of communication from the patient to the doctor. To further narrow the protection offered by this statute to

mined from the record, the doctor in question in *Beemer* was a psychiatrist. The court admitted the doctor's testimony into evidence, after determining that the examination he conducted must have consisted of communication from his patient, but noting that the testimony did not go to the substance of the communication, that much of the communicated information came from the patient's husband who was present during the examination, and that nothing was revealed in the testimony which would tend to blacken the character of the patient.

It must also be noted, however, that the examination in *Beemer* was occasioned by a custody action and not the onset of any psychiatric illness. In Mrs. B's case, there was no expectation on the part of Mrs. B that her confidential communications would be disclosed, nor were there present the self-censoring motives which would exist at an examination prompted by pending litigation and conducted in the presence of those with adverse interests in a custody proceeding.

the verbal expression of the patient and to permit the disclosure of material derived from these communications would be to undermine the very legislative intent we are attempting to enforce. We held in the newsman's privilege case, *Taylor & Selby Appeals*, 412 Pa. 32, 193 A.2d 181 (1963), that where a newsman's source is protected under the statute, so, too, are all documents and records which would tend to disclose that source. Here, I conclude that effective protection again requires that the records as well as the communications from which they are derived are subject to the statutory privilege.

Further, the extent to which *Phillips* controls the facts of this case is unclear. First, in 1929, the Phillips court's could not have anticipated the extension of its rationale to the psychotherapeutic situation. Second, the court's order did not go to the psychiatrists whose entries were the subject of the dispute. It would be a serious burden on an apparently protected party if that party had either to rely on an administrator, record-keeper, or even judicial officer to make the initial determination that material in records could not have been learned by the attending doctors without patient communication or to bear the expense and difficulty of locating and bringing forward all the doctors who were active in the case. Finally, as Mr. Justice Manderino has observed, a psychotherapeutic examination, alone, can rarely, if ever be conducted in the absence of any communication.

Protective statutes are to be read broadly where necessary to preserve the public policy they reflect. See Act of March 23, 1972, supra, ("This act should be liberally construed to carry out these objects and purposes."), *Taylor & Selby Appeals*, supra, (citing as a similar statute the Act of 1907).

In the absence of any indication that these records did not involve results obtainable only on the basis of Mrs. B's confidential communications, the Act of 1907 should prevail.

## V

It remains to be determined whether disclosure of these records would tend to blacken the character of the patient.

No Pennsylvania case holding disputed material to be communicative, within the meaning of the statute, has addressed the issue of whether disclosure of the material did create the risk of blackening the patient's character. In *Commonwealth ex rel. Romanowicz v. Romanowicz*, 213 Pa. Super. 382, 248 A.2d 238 (1968), no issue arose as to the admissibility of the psychiatric records since the patient consented to their admission. In *Romanowicz*, however, all the testimony of an examining psychiatrist was ruled inadmissible where the patient failed to consent to it. Further, the examination in question was prompted by pending custody litigation and not by any medical complaint.

The opinion of Mr. Justice Manderino reads *Skruch v. Metropolitan Life Insurance Co.*, 284 Pa. 299, 131 A. 186 (1925) (diagnosis of epilepsy not a "communication" and disease not loathsome) to support the rule that only where there is a risk that the patient will be thought to be suffering from a "loathsome disease" will the confidential material tend to blacken the patient's character. Accepting, arguendo, this characterization of the "blackening" requirement, I cannot conclude, as does Mr. Justice Manderino, that "psychiatric treatment does not evidence the existence of such a condition," p. 423, or that it does not tend to be evidence that such a condition exists.

A "loathsome" disease is one the occurrence of which evidences some weakness or corruption of the moral character. 1 Compact Edition of Oxford English Dictionary, pp. 1646–7. It is reasonable to assume with respect to physical disease and illness that it is not loathsome. It is indeed the exception to find a physical condition which is, or is viewed to be, caused by morally opprobrious conduct or thought. Thus, disclosure that a person has suffered or sustained a particular physical condition will rarely tend to blacken his moral character.

It is inappropriate, however, to carry over this assumption to the area of psychological disease. New York and California have recognized that where counseling is involved, patients "must reveal the innermost parts of their emotional

being—their most dreadful fantasies, their fears, their angers and desires." *Yaron v. Yaron*, 83 Misc.2d 276, 372 N.Y.S.2d 518 (1958); *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 citing *In re Lifschultz*, 2 Cal.3d 415, 431–34, 85 Cal.Rptr. 829, 467 P.2d 557 (1970). Disclosure of this sort is typical both in the diagnostic and therapeutic phases of psychotherapeutic treatment, Slovenko, *Psychotherapy, Confidentiality & Privileged Communication* 47 (1966) cited in Appellant's Brief, p. 14, and cannot be expected to occur in the absence of a confidential relationship.

Therefore I would hold that the Act of 1907 protects these records and reverse the order of the court of common pleas holding appellant in contempt.

EAGEN, Chief Justice, dissenting.

Because of the important state interest in treatment and welfare of juveniles, I do not believe the right of privacy should prevail under the circumstances of this case.

POMEROY, Justice, dissenting.

I agree with the opinion of Mr. Justice MANDERINO announcing the decision of the court insofar as it concludes that the physician-patient privilege, as embodied in the Act of June 7, 1907, P.L. No. 462, as amended, 28 P.S. § 328, is not applicable to the case at bar and is no defense to the valid court order that the physician-appellant produce a patient's records.

My quarrel is with the gratuitous creation of a constitutional question where none is presented. No such issue was raised in the lower court nor was it presented to this Court either in the briefs or at the time of oral argument. The sole question brought to this Court by the appellant is the applicability of the statutory physician-patient privilege (28 P.S. § 328, *supra*) as a defense to the lower court's order that the appellant produce certain records.

We have long condemned the practice of appellate courts anticipating arguments not presented by parties to a contro-

versy. *See, e. g., Girard School District v. Pittinger,* 481 Pa. 91, —— n. 10, 392 A.2d 261, 265 n. 10 (1978); *Reed v. Sloan,* 475 Pa. 570, 575 n. 4, 381 A.2d 421 (1977); *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975). Especially is this policy of judicial restraint wise and salutary where constitutional questions are involved. The lead opinion pays lip service to this principle when it observes that we will "avoid the constitutional question if possible." *Ante* at 422. But the opinion then ignores the precept by undertaking a detailed analysis of the nature and extent of the constitutional right of privacy which says, the opinion, has not heretofore been considered by a Pennsylvania appellate court. But see *Adler v. Montefiore Hospital Ass'n of Western Pennsylvania,* 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974).

The opinion of Mr. Justice MANDERINO states that the constitutional argument is made by appellant. I respectfully disagree. The only place appellant mentions the point is on page 21 of a twenty-seven page brief. There, in the course of discussing the issue, "Considerations of Public Policy Do Not Justify the Abrogation of the Doctor-Patient Privilege in This Case", appellant has included a footnote which reads:

"⁹ The *Lifschutz* [*In Re Lifschutz,* 2 Cal.3d 415, 85 Cal. Rptr. 829, 467 P.2d 557 (1970)] court went on to state:

'We believe that a patient's interest in keeping such confidential revelations [as are disclosed in psychotherapy] from public purview, in retaining this substantial privacy, has deeper roots than the California [privilege] statute and draws sustenance from our constitutional heritage. In *Griswold v. Connecticut, supra,* 381 U.S. 479, 484 [85 S.Ct. 1678, 14 L.Ed.2d 510], the United States Supreme Court declared that "[v]arious guarantees [of the Bill of Rights] create zones of privacy," and we believe that the confidentiality of the psychotheraputic session falls within one such zone.' [85 Cal.Rptr. at 839], 457 [sic] P.2d at 567.

"Thus, it would appear that even if the Pennsylvania statute did not protect Mrs. B's records in this case, those records would be protected from disclosure by the constitutional right to privacy. *See generally* Note, 'Psychotherapy and *Griswold* : Is Confidence a Privilege or Right?', 3 Conn.L.Rev. 599 (1971); Note, 'Medical Jurisprudence—Privileged Communications Between Physician and Patient—State Regulation and Right to Privacy,' 39 Tenn.L.Rev. 515 (1972)."

Such a by-the-way reference to an issue can hardly be considered a tendering of that issue to this Court. See Pa.R.A.P., Rule 2115.* If, however, the Court were of the view that the issue should be reached and decided, it should at the least order reargument so that this difficult and important matter may be adequately presented to us by all parties.

For myself, I decline to address the issue on the basis of footnote 9 of appellant's brief, *supra.*

NIX, J., joins in this dissenting opinion.

---

* In any event, no constitutional question having been presented to the trial court, it should be held waived in this Court. *See, e. g., Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).