392 A.2d 261

GIRARD SCHOOL DISTRICT et al.

v.

John C. PITTENGER, Secretary of Education, and the State Board of Education, et al., Appellants.

Supreme Court of Pennsylvania.

Argued Sept. 29, 1977.

Decided Oct. 5, 1978.

Robert P. Kane, Atty. Gen., J. Justin Blewitt, Jr., Edward A. Miller, Deputy Attys. Gen., Dept. of Justice, for appellants.

Reed B. Day, Washington, for appellees.

Michael I. Levin, William Fearen, Harrisburg, for amicus, Pa. School Boards Ass'n.

Steven S. Goldberg, Philadelphia, for amicus, Parents Union for Public Schools in Philadelphia.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

This appeal requires us to determine whether certain regulations adopted by the Pennsylvania State Board of Education (herein "State Board" or "Board") pertaining to student conduct and discipline are void and unenforceable for want of authority in the State Board to adopt them. The Commonwealth Court held that the State Board lacked authority and gave judgment for the plaintiff School Districts, appellees here. We, on the contrary, are convinced that ample authority for the action of the Board is to be found in the Administrative Code of 1929 (herein "Administrative Code")[1], and therefore reverse the decree entered below.

1. Act of April 9, 1929, P.L. 177, art. I, § 1 *et seq., as amended,* 71 P.S. § 51 *et seq.* (1962 & Supp.1978).

█ The challenged regulations, entitled "Student Rights and Responsibilities," were adopted and published by the State Board in 1974.[2] They treat of a wide range of diverse subjects, including corporal punishment, suspension and expulsion from school, flag salute and permissibility of regulations governing hair and dress.[3] The initial draft of the statement was made by a student advisory board (an adjunct of the State Board) and was widely distributed within the educational community for comment. Final approval by the State Board followed public hearings. The present suit in equity was brought by twenty-nine local school districts and three taxpayers[4] seeking declaratory and injunctive relief, which was ultimately granted by the Commonwealth

**2.** There is no challenge to the manner in which the regulations were prepared and promulgated. The record indicates full compliance with the publication and notice requirements of the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, art. I, § 101 *et seq.*, 45 P.S. § 1101 *et seq.* (Supp.1978), effective at the time of the adoption of the regulations.

**3.** The table of contents of the relevant portion of Chapter 12 of the Regulations of the State Board of Education is as follows:

"CHAPTER 12. STUDENTS
STUDENT RIGHTS AND
RESPONSIBILITIES

Sec.
12.1. Free education and attendance.
12.2. Student responsibilities.
12.3. School rules.
12.4. Discrimination.
12.5. Corporal punishment.
12.6. Exclusions from school.
12.7. [Reserved].
12.8. Hearings.
12.9. Freedom of expression.
12.10. Flag salute and pledge of allegiance.
12.11. Hair and dress.
12.12. Confidential communications.
12.13. [Reserved].
12.14. Searches.
12.15. Recommended guidelines."

The text comprises fourteen (14) printed pages.

**4.** The taxpayers were found by the Commonwealth Court not to have standing, and they were eliminated as plaintiffs.

Court.[5] This appeal by the State Board and the concerned state officials followed.[6]

As the Commonwealth Court correctly perceived, resolution of the present dispute depends upon an analysis of the scope of the General Assembly's grant of authority to the State Board; our task is to determine whether the promulgation of the regulations by the Board was within the limits of the authority delegated to it by the legislature. *Pennsylvania Human Relations Commission v. Chester School District,* 427 Pa. 157, 233 A.2d 290 (1967).

We have recently had occasion to distinguish between two general types of rule-making, one or the other of which a legislature customarily authorizes administrative agencies which the legislature has created to employ in the discharge of agency responsibilities. See *Uniontown Area School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 76–77, 313 A.2d 156, 169 (1973). The description of these types of rule-making power is appropriate as background for the analysis we must make here:

"There is a well-recognized distinction in the law of administrative agencies between the authority of a rule adopted by an agency pursuant to what is denominated by the textwriters as *legislative* rule-making power and the authority of a rule adopted pursuant to *interpretative* rule-making power. The former type of rule 'is the product of an exercise of legislative power by an administra-

5. The named defendants were the State Board of Education, the Secretary of Education, the State Treasurer and the Auditor General. They interposed preliminary objections to the complaint in the nature of a demurrer. The objections of the Auditor General were sustained and the complaint dismissed as to him. The Commonwealth Court divided evenly as to the objections of the other defendants, however, and those objections were not sustained. The State Board then filed an answer to the complaint on the merits. The plaintiffs filed requests for admissions to which the defendants did not respond. *See* Pa.R.C.P. 4014(b). Plaintiffs then moved for summary judgment, which the court granted, Judge Rogers dissenting.

6. Appellate jurisdiction is in this Court by virtue of § 203 of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, No. 223, art. II, 17 P.S. § 211.203, now superseded by Section 723(a) the Judicial Code, 42 Pa.C.S. § 723(a) (effective June 28, 1978).

tive agency, pursuant to a grant of legislative power by the Legislative body', and 'is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable'. K. C. Davis, 1 Administrative Law Treatise § 5.03, at 299 (1958). A court, in reviewing such a regulation, 'is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action . . . involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles . . . as to be the expression of a whim rather than an exercise of judgment.'" *American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 236–37, 57 S.Ct. 170, 172, 81 L.Ed. 142 (1936) [additional citations omitted].

"An interpretative rule on the other hand depends for its validity not upon a *law*-making grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets. While courts traditionally accord the interpretation of the agency charged with administration of the act some deference,[26] the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation. See, e. g., *United States v. Cartwright,* 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)." Id. (footnote omitted) (emphasis in original)

The General Assembly in its Administrative Code, *supra* note 1, vested broad power in the State Board of Education. Thus Section 1317(a) of the Code, 71 P.S. § 367(a) (Supp. 1978) provides:

"(a) The State Board of Education shall have the power, and its duty shall be, to review the policies, standards, rules and regulations formulated by the Council of Basic Education and the Council of Higher Education, and adopt broad policies and principles and establish standards governing the educational program of the Commonwealth."

The specific provision as to rule-making is in paragraph (g) of the same section. It states that the Board "shall make all reasonable rules and regulations necessary to carry out the purposes of this act." 71 P.S. § 367(g).

The parties agree that the rule-making power with which the Board has been endowed by these provisions of the Code is legislative in nature. The local boards, however, do not agree that the challenged regulations fall within that grant of power. Specifically, they contend that student conduct and discipline are not elements of education as such. They argue that the clear and detailed grant of power which the Legislature has made to the local boards by means of the School Code of 1949 [7] in the area of student discipline belies any intent to give to the State Board cognizance over such matters.[8] We disagree.

7. Act of March 10, 1949, P.L. 30, art. I, § 101 *et seq., as amended,* 24 P.S. § 1–101 *et seq.* (1962 & Supp.1978).

8. In particular, the appellees rely on Sections 510, 511(a), 1317, 1318 and 1338 of the School Code, 24 P.S. §§ 5–510, 5–511(a), 13–1317, 13–1318 and 13–1338. These texts of these sections follow:
   "§ 5–510.
   *The board of school directors in any school district may adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding the management of its school affairs and the conduct and deportment of all superintendents, teachers, and other appointees or employes during the time they are engaged in their duties to the district, as well as regarding the conduct and deportment of all pupils attending the public schools in the district, during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.*
   *       *       *       *       *       *
   "§ 5–511.
   *(a) The board of school directors in every school district shall prescribe, adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding (1) the management, supervision, control, or prohibition of exercises, athletics, or games of any kind,*

The delegation of legislative power to the State Board in Section 1317 of the Administrative Code is both far-reaching and unequivocal. All matters falling within the "educational program of the Commonwealth" are included in that Board's domain; the Board is not only directed to "adopt broad policies and principles" but also to "establish standards governing the educational programs." It is then specifically mandated to "make all reasonable rules and regulations" to implement the educational program. The

school publications, debating, forensic, dramatic, musical, and other activities related to the school program, including raising and disbursing funds for any or all of such purposes and for scholarships, and (2) the organization, management, supervision, control, financing, or prohibition of organizations, clubs, societies and groups of the members of any class or school, and may provide for the suspension, dismissal, or other reasonable penalty in the case of any appointee, professional or other employe, or pupil who violates any of such rules or regulations.

\* \* \* \* \* \*

"§ 13–1317.
Every teacher, vice principal and principal in the public schools shall have the right to exercise the same authority as to conduct and behavior over the pupils attending his school, during the time they are in attendance, including the time required in going to and from their homes, as the parents, guardians or persons in parental relation to such pupils may exercise over them.

\* \* \* \* \* \*

"§ 13–1318.
Every principal or teacher in charge of a public school may temporarily suspend any pupil on account of disobedience or misconduct, and any principal or teacher suspending any pupil shall promptly notify the district superintendent or secretary of the board of school directors. The board may, after a proper hearing, suspend such child for such time as it may determine, or may permanently expel him. Such hearings, suspension, or expulsion may be delegated to a duly authorized committee of the board.

\* \* \* \* \* \*

"§ 13–1338.
In case any child of compulsory school age cannot be kept in school in compliance with the provisions of this act, on account of incorrigibility, truancy, insubordination, or other bad conduct, of [or] if the presence of any child attending school is detrimental to the welfare of such school, on account of incorrigibility, truancy, insubordination, or other bad conduct, the board of school directors may, by its superintendent, secretary, or attendance officer, under such rules and regulations as the board may adopt, proceed against said child before the juvenile court, or otherwise, as is now

question, then, boils down to whether matters of student conduct and discipline are embraced within the concept of "education" or an "educational program." We are satisfied that the answer must be in the affirmative.

One need not be a savant in the field of education to apprehend that standards of student conduct and discipline in the sense of punishment for misbehavior have traditionally been considered part and parcel of teaching. The conjunction of these two aspects of the learning process is recognized in the dictionary definition of education. Thus "education" is the "impartation or acquisition of knowledge, skill or discipline of character." Webster's International Dictionary (2d ed. 1942). The correlation is also acknowledged by authors on works on education. Thus, Professor Brown writes:

> "Discipline is the sum total of those activities not given to the task of presenting subject matter to students. ˙ It is, in essence, the teacher's efforts to influence behavior other than that connected with learning facts. *Discipline, as is instruction, is a means by which the basic goal of the educational institution can be attained. This goal is to prepare the student to live happily and successfully within his society. In order to attain this rather comprehensive goal, the school seeks to develop certain behaviors (skills, habits, and attitudes) which will prepare the individual to make the transition from student to citizen.* Because of the unique nature of each student, these behaviors are not precisely the same for each individual, but there is a core which the school seeks to transmit to all. This core is broken down into specific goals, and the teacher uses instruction and discipline, or more likely, both simultaneously, to achieve the school's objectives." D. Brown, Changing Student Behavior, A New Approach To Discipline 23 (1971) (emphasis added).

*See also* Restatement, Second, of Torts, §§ 147(2), 153(2) (1965); J. M. Lee, Elementary Education: Today and To-

or may hereafter be provided by law for incorrigible, truant, insubordinate, or delinquent children."

morrow 70–73, 118–120 (2d ed. 1972). From these authorities, as well as from common experience, we conclude that the maintenance of fitting standards of student behavior and the imposition of reasonable sanctions for the departure from such standards are essential elements of the educational process as it is carried on in a school setting; they serve both as protective mechanisms for guaranteeing an environment conducive to the learning experience and as a character-building tool essential to the pupil's preparation for effective participation in adult life.

Turning to our case law, we find that this Court has already accepted a definition of the term "educational" which recognizes its expansive application and which is clearly broad enough to include the disciplinary aspect which we have just discussed.

"In 28 C.J.S. 834, the word 'educational' is defined as follows: "The word taken in its full sense, is a broad, comprehensive term, and may be particularly directed to either mental, moral or physical faculties, but in its broadest and best sense it embraces them all, and includes, not merely the instructions received at school, college, or university, but the whole course of training—moral, intellectual and physical.' " *Appeal of Gilden,* 406 Pa. 484, 492, 178 A.2d 562, 566 (1962).

The fact that this broad concept of education was uttered in the context of a zoning case makes it no less pertinent. See also *Delaware Community College Appeal,* 435 Pa. 264, 254 A.2d 641 (1969); *Appeal of St. Sophia Religious Association of Ukrainian Catholics,* 27 Pa.Cmwlth. 237, 365 A.2d 1389 (1976); *School Lane Hills, Inc. v. East Hempfield Township Zoning Hearing Board,* 18 Pa.Cmwlth. 519, 336 A.2d 901 (1975); *Burgoon v. Zoning Hearing Board of Charlestown Township,* 2 Pa.Cmwlth. 238, 277 A.2d 837 (1971); *Kaplan v. School District of Philadelphia,* 178 Pa.Super. 88, 113 A.2d 164 (1955).

We hold, accordingly, that in issuing the regulations on "Student Rights and Responsibilities" the State Board was acting within the field of education and, as such, was not

exceeding the authority of the General Assembly's grant of legislative rule-making power contained in Section 1317 of the Administrative Code.

In so holding, we are not unmindful of the fact that in the School Code, *supra* note 6, the legislature has delegated substantial authority with respect to student discipline to local school boards. It does not follow, however, as appellees argue, that this grant of power to local boards precludes any action by the State Board in the area. The two grants of authority may be read as complementary rather than as mutually exclusive. Sections 510 et al. of the School Code and the statement of the State Board on Student Rights and Responsibilities should, in fact, be considered as *in pari materia*.[9] See *Pa. Fire Officers Association v. Pennsylvania Labor Relations Board,* 470 Pa. 550, 555, 369 A.2d 259, 261 (1977). By and large, the State Board's regulations here in question establish broad guidelines within which discipline is to be carried out; the local boards retain discretion under the School Code to determine the nature of the discipline to be administered and the conditions under which it will be imposed. We leave for another day any questions that might be posed by irreconcilable state and local regulations. Similarly, whether any particular regulation contained in the State Board's document may be invalid for any reason, such as overbreadth, is not now before us.[10]

9. Statutes which pertain to the same subject matter, are, where possible, to be construed as one. *See* Statutory Construction Act, Act of November 25, 1970, P.L. 707, No. 230, *as amended,* 1 Pa.C.S. § 1932 (Supp.1978).

10. As we noted above, legislative rule-making of the sort here involved "is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Uniontown School District, supra,* quoting K. C. Davis, 1 Administrative Law Treatise, § 5.03 at 299 (1958). Our holding today is that the challenged regulations fall within the granted power. No question of the reasonableness of the regulations, either in general or in particular, is presented, and we express no view with respect thereto.

The decree of the Commonwealth Court is reversed. Costs on appellants.

PACKEL, J., did not participate in the consideration or decision of this case.