937 A.2d 1028

**Johnna SEETON, Appellant**

v.

**PENNSYLVANIA GAME COMMISSION, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 19, 2005.

Decided Dec. 27, 2007.

566

Gordon Alan Einhorn, Harrisburg, for Johnna Seeton, appellant.

Richard Douglas Sherman, Harrisburg, for Pennsylvania Game Commission, appellee.

BEFORE, CAPPY, C.J.; CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice BAER.[1]

Appellant Johnna Seeton filed in the Commonwealth Court a Complaint in Mandamus alleging that the Pennsylvania Game Commission (Commission) improperly concluded that it lacked authority to interfere with what she alleged were the Tioga Boar Hunt Preserve's (Tioga) ongoing violations of the Pennsylvania Game and Wildlife Code, 34 Pa.C.S. §§ 101, *et seq.* (Game and Wildlife Code). She asked the Commonwealth Court to reject the Commission's claim that it lacks

1. This case was reassigned to this author.

jurisdiction over Tioga and hold that the Commission's own regulations as well as its statutory mandate require enforcement of the relevant provisions against Tioga. The Commonwealth Court denied Seeton relief on the basis that the Commission's interpretations of its own administrative provisions were not inconsistent with the Game and Wildlife Code and therefore are entitled to a court's deference. Because we find that the Commission's interpretation of its own regulation is inconsistent with its plain language and irreconcilable with the legislative intent manifest in the Game and Wildlife Code, we reverse.

According to the Commission, Tioga "is in the business of selling 'canned hunts' in which customers pay a fee to shoot and kill an animal in an enclosed area which limits the ability of the animal to escape and the amount of pursuit in which the customer must engage." Brief for Commission at 7. Seeton contends that "[a]nimals used in canned hunts are often drugged, tied to stakes or lured to feeding stations in order to further assure that the 'hunter' will get the guaranteed kill that has been promised by the hunting preserve's proprietor." Complaint in Mandamus at 2, ¶ 6.

This controversy began when Seeton, a resident of Dauphin County, initiated a correspondence with the Pennsylvania Game Commission seeking to compel enforcement against the Preserve, which Seeton averred serially violated provisions of the Game and Wildlife Code. By responsive letter, the Commission's Chief Counsel rejected Seeton's contention that the animals hunted at the Preserve, including wild boar,[2] were

2. In Seeton's Complaint in Mandamus, in addition to wild boar, she averred that Tioga also offers canned hunts of such animals as deer, elk, Corsican ram, and buffalo. Complaint in Mandamus at 2, ¶ 7. At ¶ 8, however, her focus turns to wild boar alone, a move reflected in the Commonwealth Court's decision in this case. See Cmwlth. Ct. Slip Op. at 3 (outlining Seeton's allegations "that some of the animals hunted at [Tioga], specifically the various types of wild boar, are defined 'protected mammals' "). Before this Court, Seeton limits her argument to wild boar, and the analysis that follows tracks that limitation. That said, in light of our holding that the Commission's claim that merely fencing in any sort of animal precludes its classification as a "wild animal" subject to the Commission's protection, we expect that the Commission

"protected mammals" pursuant to the Commission's regulations promulgated under the Game and Wildlife Code. *See* 58 Pa.Code § 133.1.[3] In particular, the Commission observed that the term "wild mammals" as used in § 133.1 is defined nowhere in the Game and Wildlife Code or the Commission's regulations. The Commission, resorting to a dictionary definition of the word "wild," thus opined that "wild mammals" must apply only to "mammals that are currently living in a state of nature," Commission Letter to Seeton, 4/29/03 (internal quotation marks omitted), which "excludes mammals that are currently living in a state of captivity, either in pens or within enclosures." *Id.* Because the animals at the Preserve are kept within enclosures, the Commission concluded that they are not "wild" for purposes of the Game and Wildlife Code and regulations issued thereunder; rather, they are "the personal property of their owners." *Id.*

On October 14, 2004, Seeton filed a Complaint in Mandamus in the Commonwealth Court in its original jurisdiction. *See* 42 Pa.C.S. § 761(a)(1) (providing original jurisdiction in the Commonwealth Court of civil actions against the Commonwealth). She averred that she had taxpayer standing pursuant to this Court's decision in *In re Application of Biester*, 487 Pa. 438, 409 A.2d 848 (1979) (granting taxpayers standing to challenge government action where no one is better situated to challenge that action and it will otherwise evade judicial review). The Commission, she argued, is an arm of Pennsylvania's executive branch and receives public funding from the sale of timber on game lands owned by the Commonwealth of Pennsylvania. Thus, per *In re Biester*, where the Commission's action will

will consider whether any of the various species hunted at Tioga qualify as "wild animals" are not subject to.its protection.

**3.** Section 133.1, promulgated by the Commission, provides:

Wild mammals not defined in the act as furbearers or game animals shall be classified as protected mammals to be taken only under the act and this part. See Chapter 21, Subchapters B and C of the act (relating to destruction for agricultural protection; and destruction of game or wildlife in self-defense) and § 141.3 (relating to protection removed under certain circumstances).

58 Pa.Code § 133.1.

otherwise go unchallenged, it is subject to challenge by Seeton in her capacity as a Pennsylvania taxpayer.

In her Complaint, Seeton averred that the Commission is aware of Tioga's ongoing violations of the Game and Wildlife Code, including the restraint and drugging or luring of prey to facilitate a kill by a hunter who has paid for the privilege. She further asserted that the wild boar hunted at Tioga are "protected mammals" under the Game and Wildlife Code and the Commission's regulations. Because "protected mammals" may be hunted only pursuant to express provisions of the Game and Wildlife Code or the Commission's regulations, *see* 58 Pa.Code § 133.1, and because neither the Game and Wildlife Code nor the Commission's regulations authorize the hunting of boar, Seeton asserted that Tioga is in violation of § 133.1.

The Commission filed Preliminary Objections to Seeton's Complaint in Mandamus. First, the Commission challenged Seeton's standing to bring the complaint in the first instance. The Commission contended that Seeton had no interest in the litigation exceeding that of any other member of the public.

In the alternative, the Commission defended the claim on the merits in much the same terms as it had in its prior correspondence with Seeton. Specifically, it argued that "canned hunts" on private property fall outside the Commission's "realm of regulation" because no animal can be "wild" that is "contained on private property within fenced enclosures." Preliminary Objections at 2, ¶ 6. It emphasized that its interpretation of the Game Code is entitled to administrative deference. *Id.* at 2, ¶ 7. It further averred that mandamus is an inappropriate mechanism, as it characterized Seeton's claim, "to compel the [Commission] to interpret the Game [and Wildlife Code]" as Seeton would prefer. *Id.* at 2, ¶ 9.

The Commonwealth Court began its ruling by rejecting the Commission's argument that Seeton lacked standing. The court acknowledged the undisputed point that Seeton lacked traditional standing, which requires a showing of a substantial

individual interest in the matter, *see William Penn Parking Garage, Inc., v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975), but ruled that Seeton had demonstrated standing pursuant to this Court's decision in *In re Biester,* 487 Pa. 438, 409 A.2d 848 (1979). Specifically, the court noted that neither Tioga nor its clients have any incentive to challenge the Commission's alleged non-enforcement of the Wildlife and Game Code, because they benefit from that non-enforcement. Thus, the court determined that Seeton had standing because the challenge might otherwise evade judicial review.

The Commonwealth Court, however, rejected Seeton's challenge on the merits. The court found tenable Seeton's interpretation that wild boar are "protected mammals" subject to the Commission's protection under 58 Pa.Code § 133.1, but it found equally tenable the Commission's interpretation that the term "protected mammals," which includes "wild mammals" under § 133.1, does not apply to wild boar contained in enclosures, because by definition a penned animal cannot be "wild." Finding both interpretations "reasonable" under the relevant statutory and regulatory provisions, the court determined that it was bound to defer to the Commission's account. *See Bethenergy Mines, Inc., v. Dep't of Envtl. Protection,* 676 A.2d 711 (Pa.Cmwlth.1996). Accordingly, it denied Seeton relief.

Before this Court, the Commission renews its challenge to Seeton's standing to bring this claim, which we take up as a preliminary question going to this matter's justiciability.[4] In *In re Biester,* this Court, applying its decision in *William Penn Parking Garage,* observed that traditional standing requires petitioner to demonstrate a substantial, direct, and immediate interest in the outcome of the suit

---

4. As noted, the Commonwealth Court denied the Commission's preliminary objections on the question of standing. With respect to the Commonwealth Court's grant or denial of preliminary objections, as well as the other questions of law taken up, *infra,* our standard of review is *de novo* and our scope of review plenary. *Luke v. Cataldi,* 932 A.2d 45, 49, n. 3 (Pa.2007). Like the Commonwealth Court, however, in considering preliminary objections "we must accept the facts alleged in Appellants' complaint and all reasonable inferences that may be drawn therefrom as true." *Id.*

surpassing the common interest of all citizens in procuring obedience to the law. *In re Biester*, 409 A.2d at 851. We recognized, however, that "[c]ertain cases exist which grant standing to taxpayers where their interest arguably does not meet the [above] requirements of *Wm. Penn.*" *Id.* at 852. "[I]n those cases ..., the granting of standing where the degree of causal connection between the action complained of and the injury alleged is small, can be explained by the policy behind granting taxpayers standing." *Id.* The "fundamental reason for granting standing" in such cases "is simply that otherwise a large body of governmental activity would be unchallenged in the courts." *Id.* (quoting *Faden v. Phila. Housing Auth.*, 424 Pa. 273, 227 A.2d 619, 621–22 (1967)). Thus, taxpayer standing may be granted when it "ensure[s] ... judicial review which would otherwise not occur," a circumstance that arises where "those directly and immediately affected by the complained of expenditures are beneficially affected as opposed to adversely affected." *Id.*

In Seeton's initial action before the Commonwealth Court, she alleged that, absent her challenge, "the refusal of the Game Commission to take action against Tioga will otherwise go unchallenged," *id.* at 4, ¶ 18; that she "has no alternative channels for redress other than [the Commonwealth] Court," *id.* at 4, ¶ 21; and that, "[o]n information and belief, there are no other persons better situated than Petitioner to assert the claim raised herein." *Id.* at 4, ¶ 23. Thus, she contended, she had standing pursuant to *In re Biester.*[5]

---

5. Regarding the Commission's character as a government agency subject to such a challenge, Seeton averred that certain state game lands "were acquired and developed using public funds derived from legislation known as 'Project 70' in or about 1963," Complaint in Mandamus at 2, ¶ 4, and that the Commission is a government agency that receives a material percentage of its annual budget from the sale of timber on state game lands owned by the Commonwealth pursuant to 34 Pa.C.S. § 706.

The Commission's own website supports Seeton's claims, indicating that, per 1962 voter referendum, $120 million in public funds were allocated to recreation and conservation programs, with $10 million allocated to the Commission "to buy hunting and fishing areas threatened by imminent development." *Pennsylvania Game Commission, State Wildlife Management Agency: 1960–1969,* available at http://www.

In response, the Commission failed entirely to address Seeton's contentions regarding standing under the analysis prescribed by *In re Biester*, relying instead on its conclusory suggestion that Seeton had no peculiar interest in the matter. Thus, it failed to respond to Seeton's assertions by identifying who would be better situated to challenge the Commission's inaction or what alternative channel would be open to such a challenge, matters critical to the *In re Biester* inquiry.[6]

*In re Biester* spoke principally to the importance of assuring that a government agency's actions not evade review for want of an aggrieved party under the limited terms of traditional standing. As noted, standing under *In re Biester* aims to "ensure . . . judicial review which would otherwise not occur," when "those directly and immediately affected by the complained of expenditures are beneficially affected as opposed to adversely affected." 409 A.2d at 852. There appears to be no one better situated than Seeton to challenge the non-enforcement asserted here. Moreover, we perceive no alternative means to invoke judicial review of the important question before us. Thus, we find no error in the Commonwealth Court's determination that Seeton had standing to bring the instant claim.

Next, we are faced with a second preliminary matter: the Commission's argument that mandamus is an inappropriate remedy in this context and that Seeton's claim must fail for that infirmity. The Commission correctly notes that

pgc.state.pa.us/pgc/cwp/view.asp?a=458&q=154059&pp=12&n=1 (last reviewed Oct. 22, 2007). The same source also corroborates Seeton's assertion that a separate 1967 initiative, "Project 500," authorized a $125 million bond issue to benefit, *inter alia*, the Game Commission. *Id.*

6. The Commission did reply substantively to Seeton's arguments regarding its public character, maintaining that she failed to demonstrate "any correlation between the [Commission's] sale of timber on State Game Lands or the purchase of State Game Lands in the 1960's and the issue of enforcing the Game and Wildlife Code against private individuals on private land." Preliminary Objections at 1, ¶ 4. As is elucidated *infra*, however, this is non-responsive to the circumstances that create standing under *In re Biester*, and the Commission does not go so far as to dispute its fundamentally public character.

mandamus does not permit a court to direct a government agency to exercise in a particular fashion a matter entrusted to that agency's discretion. Rather, mandamus is a common-law mechanism by which a court may compel a government body to perform a mandatory act where the moving party has a clear right, the government body has a corresponding duty, and the moving party demonstrates that no other remedy at law is adequate to secure relief. *Phila. Newspapers, Inc., v. Jerome*, 478 Pa. 484, 387 A.2d 425, 430 n. 11 (1978). The Commission characterizes Seeton's prayer as "seek[ing] to have [the court] impose a different interpretation of the Game and Wildlife Code than that of the Game Commission." Brief for Commission at 18.

Seeton responds that mandamus is the proper remedy where, as here, a government agency "has failed to perform [a mandatory] statutory duty." Brief for Seeton at 14. Seeton contends that the Commission's discretion is not at issue in this case, and that she does not seek to compel the Commission to act in any particular manner. Rather, she seeks to establish only that the Commission is required under the Game and Wildlife Code to bring Tioga into compliance with that Code and the regulations promulgated thereunder in a suitable fashion entrusted to its discretion. *See Phila. Newspapers, Inc.*, 387 A.2d at 430 n. 11 ("A court issuing a writ of mandamus may direct the exercise of discretion, but not performance of a particular discretionary act.").

We agree with Seeton that, assuming the validity of her allegations (as we must in the context of reviewing the Commonwealth Court's grant of preliminary objections), and assuming she prevails in establishing that the Commission's interpretation of its own regulations is inconsistent with that body's statutory mandate, mandamus is an appropriate remedy. Seeton's original prayer for relief, in full, provides:

> WHEREFORE, Petitioner Johnna Seeton demands entry of judgment against Respondent Pennsylvania Game Commission directing the enforcement against Tioga Boar Hunt Preserve of 55 Pa.Code § 133.1, ordering Tioga to cease and desist from causing or permitting the killing of protected

mammals on its premises *or otherwise directing the Commission to bring Tioga into compliance with the Game Law,* and for costs and such further relief as this Court deems proper.

Complaint in Mandamus at 4–5 (emphasis added). Her demand that the Commission be ordered "to bring Tioga into compliance with the Game Law," were it to be granted without directing any particular action in furtherance of that goal, would not impose upon the Commission's discretion. The Commission does not have the power to redefine its authority at will; the courts are an appropriate destination, and mandamus an appropriate remedy, to direct the Commission to comply with its statutory mandate to the extent it misapprehends it. *See Taylor v. Abernathy,* 422 Pa. 629, 222 A.2d 863, 868 (1966)(observing that, "while mandamus may not compel a body vested with discretionary power to exercise that power in a certain manner or to arrive at a certain decision, *mandamus will lie to compel a body so empowered to exercise its discretion within the prescribed limits,"* and so ordering (emphasis added)). Thus, we disagree with the Commission's contention that this case is about the substitution of Seeton's judgment for that of the Commission. We hold that mandamus is an appropriate remedy under these circumstances, and proceed to address the substantive issue at the heart of this case.

The instant dispute essentially focuses on the Commission's regulation concerning defining "protected mammals" and outlining the degree to which they are to be protected.

> Wild mammals not defined in the act as furbearers or game animals shall be classified as protected mammals to be taken only under the act and this part. See Chapter 21, Subchapters B and C of the act (relating to destruction for agricultural protection; and destruction of game or wildlife in self-defense) and § 141.3 (relating to protection removed under certain circumstances).

58 Pa.Code 133.1.[7] The parties agree that the wild boar here

7. Notably, this regulation appears in Pennsylvania Administrative Code Chapter 133, entitled "Wildlife Classification," suggesting that "wild mammals" are, necessarily, "wildlife" pursuant to the definition of that

in question are neither furbearers nor game animals.[8] Thus, this dispute turns on whether "wild mammals" include wild boar; if so, they must be protected mammals under the Commission's own regulation. *Cf. Town of Sullivan v. Strauss*, 171 A.D.2d 980, 567 N.Y.S.2d 921, 922 (1991) (describing, *inter alia*, Russian boar as "exotic animals generally considered wild and undomesticated").

Seeton argues that the Commission's interpretation of its own regulation is unsustainable under the language of that provision and the Game and Wildlife Code, and that the Commission, in fact, is bound to enforce its regulations against Tioga notwithstanding that the alleged violations harm only privately owned and fenced-in wild boar rather than free-roaming quarry. Seeton maintains that wild boar are "wild mammals" under the Game and Wildlife Code and thus "protected mammals" under § 133.1, regardless of whether they are enclosed. The Game and Wildlife Code, Seeton emphasizes, empowers and directs the Commission "to protect, propagate, manage, and preserve the game or wildlife of this Commonwealth and to enforce, by proper actions and proceedings, the laws of this Commonwealth relating thereto." 34 Pa.C.S. § 322(a).[9] Pointing as well to the discretion conferred upon the Commission to regulate hunting, *id.* §§ 322(c)(1)-(7), classify wild birds and animals, *id.* § 322(c)(8), manage and develop game lands, *id.* § 322(c)(10); and to promulgate necessary and appropriate regulations concerning hunting and fur-taking in the Commonwealth, *id.* § 2102(a), Seeton argues that "the Code makes clear that the Game Commission has

term provided by the Game and Wildlife Code, an identification to which we will return, *infra*.

8. Subject to modification by Commission regulation, § 102 defines "furbearers" as "the badger, the fisher, the mink, the muskrat, the opossum, the otter, the pine marten, the striped and spotted skunk, the beaver, the raccoon, all weasels, the red and gray fox and the bobcat," and defines "game animals" as "the elk, the whitetail deer, the bear, the cottontail rabbit, the snowshoe hare, the red, gray and fox squirrel and the groundhog or woodchuck." The Commission does not argue that it has, by regulation, modified these definitions in any material regard.

9. Section 322(b) grants the Commission "the power and duty to take all actions necessary for the administration and enforcement of this title."

jurisdiction over all 'wildlife' in the Commonwealth." Brief for Appellant at 8. "Wildlife," Seeton observes, is defined by the Game Code as "wild birds, *wild mammals*, and facsimiles thereof, regardless of classification, whether protected or unprotected, including any part, product, egg or offspring thereof." 34 Pa.C.S. § 102 (defining terms)(emphasis added). Seeton avers that wild boar therefore are "wild mammals" subject to the Commission's unqualified protection, notwithstanding the Commission's claim to the contrary.

The Commission acknowledges that § 133.1 binds it to police the "taking" of "wild mammals," but takes the position that boar are not "wild mammals" for purposes of that regulation. Particularly, the Commission maintains that, because the term "wild mammals" is not defined by the Game Code or the Commission's regulations, it should be understood according to its common usage. "Wild," the Commission asserts, connotes "mammals living in a state of nature," which the Commission maintains cannot include privately owned animals living in enclosures. Brief for Commission at 12. In support of this interpretation, the Commission cites sections of the Game Code that it believes support its reading of the relevant terms. At 34 Pa.C.S. § 2161(a) ("Declaration of policy"), for example, the General Assembly refers to the Commission's "proprietary ownership, jurisdiction and control of game or wildlife living free in nature," which the same provision identifies as "a renewable natural resource of this Commonwealth." [10]

10. In the same connection, the Commission directs the Court's attention to 34 Pa.C.S. § 2102(c)(Transportation, sale and disturbance of game or wildlife.), which provides, "The commission shall promulgate regulations concerning the transportation, introduction into the wild, importation, exportation, sale, offering for sale or purchase of game or wildlife or the disturbing of game or wildlife in their natural habitat." This provision, however, is more supportive of Seeton's position inasmuch as it calls upon the Commission to regulate the transportation and importation, *inter alia*, of "game or wildlife," matters that may be involved in the provision of non-indigenous boars for canned hunting in the instant case. Presumably, based upon the Commission's interpretation of the statute, boar transported or imported into the Commonwealth for the purposes of canned hunting are never "wild" based upon the Commission's understanding of that word—because during such

The linchpin of the Commission's argument, however, is not the superiority of its interpretations over alternative readings, *per se.* Rather, the Commission argues that it is entitled to prevail for precisely the reason relied upon by the Commonwealth Court: that the Commission's interpretations of its enabling statute and its regulations are at least as defensible as Seeton's, and therefore must be vindicated in light of the "strong deference" the courts typically show administrative interpretations such as those forwarded by the Commission in this case. *See Winslow–Quattlebaum v. Maryland Ins. Group,* 561 Pa. 629, 752 A.2d 878, 881 (2000) ("It is well settled that when the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation."). Subject to this deference, the Commission contends, its reading of "wild mammals" to apply only to mammals that are in fact free to roam must be sustained to the detriment of Seeton's cause of action, as the Commonwealth Court held. The Commission concludes that "it would not be reasonable for the Game Commission to contemplate that the General Assembly intended that its jurisdiction over 'protected mammals' would extend to animals which are not indigenous to Pennsylvania and naturally do not live in the wild." Brief for Commission at 15.[11]

transport they never roam free "in a state of nature"—and hence are never protected, a conclusion patently at odds with the plain language of § 2102(c). Moreover, the fact that the General Assembly modified "wildlife" with the clause "in their natural habitat" suggests that wildlife not subject to this particular provision need not be so found to retain its "wild" character, as we presume that the General Assembly intends each word of a statute to be given effect. 1 Pa.C.S. §§ 1921, 1922(2).

11. Presumably, the Commission's claim regarding living in the wild is used strictly to complement the assertion of non-indigenousness, since there can be no dispute that, in certain habitats, boar live "in the wild." Indeed, wild boar are so named because, unlike their domesticated cousins in the *sus* genus, they are not readily amenable to domestication as that word is commonly understood.

On a related note, at one point during this litigation the Commission argued that a boar is a "pig" for purposes of 1 Pa.C.S. § 1991 (Definitions) (defining "domestic animal" as "Any equine animal, bo-

■ While an agency's interpretation of an ambiguous statute it is charged with enforcing is entitled to deference, courts' deference never comes into play when the statute is clear. *See Phila. Suburban Corp.*, 635 A.2d at 118 (quoting *Girard Sch. Dist. v. Pittenger*, 481 Pa. 91, 392 A.2d 261, 263 (1978) ("While courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court. . . .")). Notably, the United States Supreme Court, in its extensive precedent concerning judicial deference to administrative interpretations of ambiguous enabling statutes, *see, e.g., Chevron, U.S.A., Inc., v. Natural Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), has recognized the dangers of deferring to interpretations developed in anticipation of litigation. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (declining to defer to agency interpretations forwarded for the first time in connection with litigation).[12]

vine animal, sheep, goat and pig"). Section 1991, in identifying equine and bovine animals as larger categories, while specifying sheep, goat, and pig more narrowly, suggests that we should not read it to encompass all members of the relevant *Sus* genus, of which pigs are but one variety. *See* http://www.ncbi.nlm.nih.gov/Taxonomy/Browser/wwwtax.cgi?mode=Undef&id=9822&lvl=3&keep=1&srchmode=1&unlock, *last reviewed*, July 26, 2007 (National Center for Biotechnology Information page identifying various species and subspecies of the genus *Sus* ); *see also* AMERICAN HERITAGE COLLEGE DICTIONARY 1567 (4th ed.)(defining a "wild boar" as "*Sus scrofa*," "the ancestor of the domestic pig"). As evinced by the legislature's selection of the categorical terms "equine" and "bovine" in the same provision, it is entirely capable of using broader terms when it so intends; yet it did not do so with respect to pigs. Consequently, we cannot agree that wild boar are domestic animals under § 1991.

**12.** This Court has never expressly adopted this limitation of *Chevron* deference, but its eminent sensibility, indeed the necessity of qualifying such deference, could not ask for a better illustration than this case, in which, according to the Commission, a feral beast such as a boar is not "wild" once it is enclosed, and a "wild mammal" is not necessarily a "wild animal." Indeed, we appear never to have explicitly adopted even *Chevron's* general rule in the context of state administrative law. The *Chevron* approach to such cases at the federal level, however, is indistinguishable from our own approach to agency interpretations of Commonwealth statutes. *Compare Chevron*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *with Phila. Suburban Corp.*, 535 Pa. 298, 635

The Game and Wildlife Code defines "wild animals" as "*all* mammals" that are not designated "domestic" pursuant to 1 Pa.C.S. § 1991. As noted, *supra* n. 11, we reject the Commission's attempt to identify wild boar as "domestic" by reclassifying it without any authority, legal or taxonomical, as a member of the supposed "pig family." Thus, wild boar necessarily are "wild animals" under the Game and Wildlife Code. If they are "wild animals" pursuant to the Game and Wildlife Code, however, it is difficult to see how they are not also "wild mammals" pursuant to 58 Pa.Code § 133.1. Wild boar are undisputedly mammals, of course, and their classification as "wild" plainly is consistent with the General Assembly's use of that term in the definitional section of the Game and Wildlife Code, pursuant to which the Commission exists and has authority to promulgate regulations.

This understanding of the Game and Wildlife Code finds further support in the larger statutory scheme, as well. "Wildlife," as we have noted, is defined by the Game and Wildlife Code as, *inter alia,* "wild birds" and "wild mammals." 34 Pa.C.S. § 102. Thus, while the Commission is correct that the term "wild mammals" is not itself defined by either the Game and Wildlife Code or the Commission's regulations, it is not wholly undetermined within the statutory scheme. Rather, "wild mammals" plainly are a subset of the term "wildlife." Thus, whatever is true of "wildlife" must also be true of "wild mammals," barring an explicit statutory exception. Interestingly, 34 Pa.C.S. § 2163(b) prohibits, *inter alia,* the release within the Commonwealth of "imported game or wildlife *or game or wildlife reared in captivity* " (emphasis added). This provision undermines the Commission's claims regarding the meaning of the word "wild" in at least two dimensions. First, insofar as "wildlife" is defined to include "wild animals" and "wild mammals," as explained above, the notion of "wildlife reared in captivity" (which posits the prospect of "wild animals" and "wild mammals" reared in captivity), is wholly

A.2d 116. Moreover, in *Philadelphia Suburban Corp.,* we quoted and relied upon *United States v. Cartwright,* 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973), a *Chevron* predecessor stating similar principles, in interpreting state taxation provisions.

antithetical to the Commission's attempt to tie the word "wild" to the degree of freedom enjoyed by a given animal. Similarly, it is impossible to "release" "wildlife" (and hence "wild animals" and "wild mammals"), the activity proscribed in the abovementioned section, if the animal's liberty is a necessary condition to its status as "wild," since one cannot release an animal from a non-captive state.[13]

Notably, the Commission does not dispute Appellant's assertion that Tioga drugs or otherwise disables wild boar to facilitate easier kills, nor does it argue that, were it bound to enforce the law against Tioga, the alleged conduct would be permissible. The Game and Wildlife Code makes it illegal to hunt through use of poison or chemical of any kind. 34 Pa.C.S. § 2308(9). Thus, the Commission effectively argues that the hunting of captive animals on fenced, private property may be undertaken by means such as drugs or restraint that violate, at a minimum, the spirit of the Game and Wildlife Code. This is an untenably narrow interpretation of its statutory mandate. *Cf., inter alia,* 34 Pa.C.S. § 103(a) (vesting the Commission with "ownership, jurisdiction over and control of game or wildlife ... to be controlled, regulated and disposed of in accordance with this title"); 34 Pa.C.S. § 2102(a) (directing the Commission "to promulgate regulations as it deems necessary and appropriate to protect[ ], preserv[e] and manage[ ] game or wildlife and game or wildlife habitat"); 34 Pa.C.S. §§ 2163–64 (charging the Commission with regulating the unlawful importation of game, wildlife, and protected birds).

Interestingly, the Commission does not in all instances espouse such a restrained view of its authority. In *Commonwealth v. Gosselin,* 861 A.2d 996 (Pa.Super.2004), appellants rescued and effectively domesticated an injured squirrel, Nut-

---

**13.** Similarly, 34 Pa.C.S. § 2930(e) governs commerce in the hides of "game or wildlife ... raised ... on premises under authority of a propagating permit," which once again makes clear that the General Assembly did not intend "wild" necessarily to imply a state of liberty. Further citations along these lines are *passim. See, e.g.,* 34 Pa.C.S. §§ 2962–64 (regulating, but not prohibiting, possession or trade in "exotic wildlife" by individuals or "menageries").

kin, while residing in South Carolina, where to do so was legal. Later, however, appellants moved to Pennsylvania, where they had some dealings with the Commission. Specifically, a Wildlife Officer, while investigating an unrelated tip lodged by appellants, observed Nutkin in the house, explained that appellants were barred by Pennsylvania law from housing a squirrel, and cited them for a violation when they refused to surrender custody of Nutkin to the officer. In resolving the case, the Commission agreed that Nutkin was a "wild animal" under the Game and Wildlife Code.

*Gosselin* does not command our holding in this case. Rather, it suggests the difficulty the Commission would encounter were it permitted to restrict "wild" to refer only to animals not in fact penned or otherwise restrained on private property. If the Game and Wildlife Code is to cohere, "wild" must refer to a category of animals based upon inherent qualities, not transient circumstances, a fact the Commission surely recognized when it insisted upon its authority to cite the appellants in *Gosselin* for failing to turn over Nutkin to the Wildlife Officer when he demanded it.

We hold that the Commonwealth Court erred in deferring to the Pennsylvania Game Commission's interpretations of the Pennsylvania Game and Wildlife Code and regulations promulgated thereunder because those interpretations are patently at odds with the enabling Game and Wildlife Code. Accordingly, the Commonwealth Court's order granting the Commission's preliminary objections on the merits is reversed, and the case remanded for further proceedings as required.[14]

Former Justices NIGRO and NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY and Justice CASTILLE and SAYLOR join the opinion.

Justice EAKIN files a dissenting opinion.

14. We do not intend, to be clear, to invade the Commission's discretion to proceed as it deems fit, having been advised of its jurisdiction to do so in this matter.

582

Justice EAKIN dissenting.

I must respectfully dissent. Appellant lacks legal standing because she does not have a substantial, direct, and immediate interest in this matter. *See Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269, 280 (1975). The majority, applying the standing exception in *In re Application of Biester*, 487 Pa. 438, 409 A.2d 848 (1979), determined appellant has taxpayer standing. Majority Op., at 570–73, 937 A.2d at 1032–34. I disagree with the majority's application of *Biester* because appellant does not demand a cessation of spending tax dollars, but rather seeks to compel appellee to spend tax dollars. Our jurisprudence does not contain case law that allows a plaintiff relying on taxpayer standing to force a governmental agency to spend money.

The majority errs by granting mandamus. Mandamus is an extraordinary writ that will only lie to compel official performance of a ministerial act or mandatory duty where there is a clear legal right in the plaintiff, a corresponding duty in the defendant, and want of any other appropriate and adequate remedy. *Jackson v. Vaughn*, 565 Pa. 601, 777 A.2d 436, 438 (2001) (citation omitted). Therefore, mandamus will not lie to compel discretionary acts. *Bronson v. Board of Probation and Parole*, 491 Pa. 549, 421 A.2d 1021, 1023 (1980), *cert. denied*, 450 U.S. 1050, 101 S.Ct. 1771, 68 L.Ed.2d 247 (1981). Here, appellees enforcement of the Pennsylvania Game and Wildlife Code (Game Code) is a discretionary and not a ministerial act; therefore, the majority errs by granting mandamus.

The majority does not afford due deference to appellee's determination that boars are not protected wild animals under the Game Code. An administrative interpretation receives controlling weight unless the interpretation is plainly erroneous or inconsistent with the agency's regulation. *Department of Public Welfare v. Forbes Health System*, 492 Pa. 77, 422 A.2d 480, 482 (1980). Appellant argues the term wild animals is defined as all non-domestic mammals; therefore, wild animals and wild mammals are the same. Although the Game Code defines wild animals as all non-domestic mammals, it

does not formally define the term wild mammal or the term wild. The boars at Tioga Boar Hunt Preserve (Preserve) are living in a state of captivity; thus, they are not living in a state of nature. The Game Codes policy declaration regarding actions for damages to game or wildlife provides:

> The Commonwealth has sufficient interest in *game or wildlife living in a free state* to give it standing, through its authorized agents, to recover compensatory and punitive damages in a civil action against any person who kills any game or wildlife or who damages any game or wildlife habitat. The proprietary ownership, jurisdiction and control of *game or wildlife living free in nature* is vested in the Commonwealth by virtue of the continued expenditure of its funds and its efforts to protect, propagate, manage and preserve the game or wildlife population as a renewable natural resource of this Commonwealth.

34 Pa.C.S. § 2161(a) (emphasis added). Considering the legislative expression of Pennsylvania's inherent interest in preserving wildlife living free in nature, the Commissions interpretation that the Preserves boars are not wild animals is not plainly erroneous or inconsistent with the Game Code.