[J-23A-2018 and J-23B-2018] [MO: Todd, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| SNYDER BROTHERS, INC., | : | No. 47 WAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court entered March |
| | : | 29, 2017 at No. 1043 CD 2015, |
| v. | : | reversing the Order of the Public Utility |
| | : | Commission entered June 11, 2015 at |
| | : | No. C-2014-2402746. |
| PENNSYLVANIA PUBLIC UTILITY | : | |
| COMMISSION, | : | ARGUED: April 11, 2018 |
| | : | |
| Appellant | : | |
| | | |
| PENNSYLVANIA INDEPENDENT OIL & | : | No. 48 WAP 2017 |
| GAS ASSOCIATION, | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court entered March |
| | : | 29, 2017 at No. 1175 CD 2015, |
| | : | reversing the Order of the Public Utility |
| v. | : | Commission entered June 11, 2015 at |
| | : | No. C-2014-2402746. |
| | : | |
| PENNSYLVANIA PUBLIC UTILITY | : | ARGUED: April 11, 2018 |
| COMMISSION, | : | |
| | : | |
| Appellant | : | |

## CONCURRING OPINION

**JUSTICE WECHT**                                   **DECIDED: DECEMBER 28, 2018**

I join in today's result, which the learned Majority reaches by way of an exemplary

analysis and opinion. Elsewhere, I have discussed the maddening complexities that can

arise when we are called upon to construe the short yet elusive term "any." *See*

*Commonwealth v. Ricker*, 170 A.3d 494, 510-13 (Wecht, J., dissenting). Because "any"

is manifestly ambiguous as codified in the definition of "Stripper well" provided at Section 2301 of Act 13,[1] we must resort to our familiar enterprise of statutory interpretation.

The Majority faithfully recites and applies several factors listed in the Statutory Construction Act[2] as guides for ascertaining legislative intent when the General Assembly's words "are not explicit." 1 Pa.C.S. § 1921(c). As part of that analysis, the Majority performs a close and careful reading of the relevant statutory provisions within the context of the "statutory structure," Maj. Op. at 30, 32-33, and "the overall legislative design," *id.* at 34-36. As the Majority astutely recognizes, Act 13 is designed to provide relief to municipalities impacted by unconventional wells. *Id.* at 32-33.

Section 2314 establishes the Unconventional Gas Well Fund ("Fund"), into which the Public Utility Commission ("PUC") deposits all impact fee payments collected from unconventional natural gas producers. The statute also details the authorized disbursements from the Fund. The Fund is largely reserved for counties and municipalities which have elected to impose an impact fee, *see* 58 Pa.C.S. §§ 2314(d), 2302(a.3), and must be used specifically to offset or address the impact of unconventional gas wells in those localities. *Id.* § 2314(g). The Marcellus Legacy Fund, which separately retains a portion of impact fees remaining after required disbursements from the Fund, is largely available for use by counties and municipalities as well. *Id.* § 2315.

These provisions demonstrate that the purpose of Act 13 is to afford relief to municipalities in order to mitigate the effects of unconventional gas wells. The provisions of Act 13 supply the context necessary to construe the legislature's use of the word "any"

---

[1]    *See* 58 Pa.C.S. §§ 2301-2318.

[2]    1 Pa.C.S. §§ 1501-1991.

at issue in this case. The objective of Act 13 would be frustrated by exempting active wells from paying impact fees upon the happenstance that production levels fall below the requisite threshold in a single month out of twelve. Moreover, although there has been no suggestion that Snyder Brothers, Inc., ("SBI") intentionally lowered production in order to avoid paying the impact fee, the interpretation that SBI suggests would incentivize unscrupulous producers to reduce well production in a single month of the year in order to avoid the statutory payment obligation, thereby thwarting the object of Act 13.

As the Majority observes, it is consistent with the overall legislative design of Act 13 to construe "any" within the definition of stripper well to mean that the impact fee is waived only for wells that "produce 90,000 cubic feet per day or less of natural gas for each and every calendar month of the year." Maj. Op. at 33. The Act requires producers to pay the impact fee for "restimulated unconventional gas wells" that produce in excess of "90,000 cubic feet of gas per day during a calendar month." 58 Pa.C.S. § 2302(d)(3). This provision parallels the definition of stripper well at issue in this case, and indicates the General Assembly's intent to impose the impact fee on wells that exceed the threshold level of production in one month of a calendar year and to exempt marginal, low-producing wells. Similarly, a "nonproducing unconventional gas well," *see id.* § 2302(b.1), is one that produces natural gas below the threshold established for a stripper well within two years of paying the impact fee. For such wells, the impact fee is suspended, but will be reinstated "for a calendar year during which the unconventional gas well produces natural gas in quantities greater than that of a stripper well." *Id.* § 2302(b.1)(1). As the learned Majority recognizes, this tells us that the General Assembly intended to impose the impact

fee upon nonproducing wells whenever such wells produce quantities in excess of 90,000 cubic feet of gas per day for even one month in the calendar year.

From my perspective, this statutory analysis does the lion's share of the work needed to discern the legislative intent and to decide this appeal. I have concerns with two other interpretive tools that the Majority uses, as I explain below.

Our lawmakers have told us that, "[w]hen the words of the statute are not explicit, the intention of the General Assembly *may* be ascertained by considering, *among other matters*" eight factors. 1 Pa.C.S. § 1921(c) (emphasis added).[3] This provision does not require courts to consider any particular factor, nor does it constrain courts' ability to look elsewhere to discern legislative intent. I write separately to urge a disciplined circumspection—and a healthy skepticism—when courts resort to the last two of the enumerated factors: "[t]he contemporaneous legislative history" (factor 7) and "[l]egislative and administrative interpretations of such statute" (factor 8). *See id.* § 1921(c)(7), (8).[4]

---

[3]     These factors include:

(1) The occasion and necessity for the statute.
(2) The circumstances under which it was enacted.
(3) The mischief to be remedied.
(4) The object to be attained.
(5) The former law, if any, including other statutes upon the same or similar subjects.
(6) The consequences of a particular interpretation.
(7) The contemporaneous legislative history.
(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

[4]     With respect to factor 8, I exclude from my discussion and my concern here "legislative . . . interpretations;" these "interpretations" are either enacted laws, which

In surveying the legislative history, the Majority embarks diligently upon a review of "earlier versions" of the legislation that became Act 13, versions apparently left behind in the drafting or negotiating process, but whose abandonment, rejection, or desuetude I cannot reliably ascribe to any uniform or discernible cause. *See, e.g.,* Maj. Op. at 24 & n.17, 29 n.19. Pressing on in its quest for meaning within the legislative history, the Majority seeks "contemporaneous explanation in the committee report," and, finding none, seeks enlightenment in the "floor debate," including extensive quotation of an "eloquent[] observ[ation]" by "a leading sponsor of th[e] measure." *Id.* at 29 n.19, 31-32, 32 n.21.

As a general matter, I am skeptical about the utility of examining draft bills, committee reports, and floor statements to discern correctly each legislator's own subjective motivations, much less the collective intent of the entire body. Indeed, while both parties here cite to the legislative history of Act 13, they draw opposite conclusions from it. *Compare* Brief for Pennsylvania Oil and Gas Association (PIOGA) at 19-20, 20 n.21 (arguing that a committee report and fiscal note contemporaneous with the development of Act 13 establish that stripper wells were always intended to be exempt from the impact fee), *with* Brief for PUC at 26 (asserting that the language used in a legislative draft indicates that the General Assembly intended to capture more wells and fees).[5] I do not agree that parsing the legislative history of Act 13's provisions reveals a

---

command our obedience, or some species of "legislative history," which are covered by factor 7, and whose challenges I address *infra*.

[5]    *See also* Brief of Amicus Curiae at 5-6 (arguing that changes in the draft legislation demonstrate the General Assembly's intent to define a stripper well as one that is incapable of exceeding the threshold production level in any single month).

definitive answer to the question before us today. Indeed, I am uncertain that doing so is bound to lead us to a correct assessment of the General Assembly's intent in the first place.

Even if I believed that legislative history could be helpful in resolving the present dispute, I would not know where to begin. Should I review the House Legislative Journal or the Senate Legislative Journal? Should I consider the statements of all Act 13 sponsors, or only the "leading" sponsors, or perhaps only those whose observations strike me as "eloquent"? Should I, like the Majority, review committee reports as well? This last category seems to me a rabbit hole that is especially dark, winding, and deep.[6]

---

[6] With regard to such materials, I am reminded of United States Senator William Armstrong's remarks during an exchange with fellow Senator Bob Dole in 1982. While debating a tax bill on the Senate floor, Senator Armstrong questioned the judiciary's tendency to rely upon legislative history, which generally consists of materials that are neither voted upon nor subject to amendment by individual legislators:

> Mr. ARMSTRONG. My question, which may take [the chairman of the Committee on Finance] by surprise, is this: Is it the intention of the chairman that the Internal Revenue Service and the Tax Court and other courts take guidance as to the intention of Congress from the committee report which accompanies this bill?
>
> Mr. DOLE. I would certainly hope so....
>
> Mr. ARMSTRONG. Mr. President, will the Senator tell me whether or not he wrote the committee report?
>
> Mr. DOLE. Did I write the committee report?
>
> Mr. ARMSTRONG. Yes.
>
> Mr. DOLE. No; the Senator from Kansas did not write the committee report.
>
> Mr. ARMSTRONG. Did any Senator write the committee report?
>
> Mr. DOLE. I have to check.

Doubtless, a diligent attorney who mines all of these sources could uncover some material that supports the arguments of SBI and PIOGA, some that supports the arguments of the PUC, and some that is ambiguous enough to support either (or indeed

---

Mr. ARMSTRONG. Does the Senator know of any Senator who wrote the committee report?

Mr. DOLE. I might be able to identify one, but I would have to search. I was here all during the time it was written, I might say, and worked carefully with the staff as they worked....

Mr. ARMSTRONG. Mr. President, has the Senator from Kansas, the chairman of the Finance Committee, read the committee report in its entirety?

Mr. DOLE. I am working on it. It is not a bestseller, but I am working on it.

Mr. ARMSTRONG. Mr. President, did members of the Finance Committee vote on the committee report?

Mr. DOLE. No.

Mr. ARMSTRONG. Mr. President, the reason I raise the issue is not perhaps apparent on the surface, and let me just state it: . . . The report itself is not considered by the Committee on Finance. It was not subject to amendment by the Committee on Finance. It is not subject to amendment now by the Senate.

. . . If there were matter within this report which was disagreed to by the Senator from Colorado or even by a majority of all Senators, there would be no way for us to change the report. I could not offer an amendment tonight to amend the committee report.

. . . [F]or any jurist, administrator, bureaucrat, tax practitioner, or others who might chance upon the written record of this proceeding, let me just make the point that this is not the law, it was not voted on, it is not subject to amendment, and we should discipline ourselves to the task of expressing congressional intent in the statute.

*Hirschey v. F.E.R.C.*, 777 F.2d 1, 8 n.1 (D.C. Cir. 1985) (Scalia, J., concurring) (quoting 128 CONG. REC. S8659 (daily ed. Jul. 19, 1982)).

"any," if one can forgive the usage) argument. This strikes me as an obvious instance when using legislative history to discern the General Assembly's intent is, to paraphrase the late Judge Harold Leventhal of the United States Court of Appeals for the District of Columbia Circuit, "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring). Although the Statutory Construction Act allows us to consider legislative history as an interpretive tool, its use may distort "the voice of the statute itself."[7] I perceive a need for a healthy caution, skepticism, and discipline with respect to courts' reliance upon legislative history.

The Majority also affords significant—indeed substantial—deference to the PUC's interpretation of the statute. Maj. Op. at 36-39. I recognize that the General Assembly has told us that we "may" do this where the statute is ambiguous. *See* 1 Pa.C.S. § 1921(c)(8).[8] I confess that I generally am disinclined to avail myself of this discretionary authority. Set aside agency rulemaking power, which is robust, and which is entitled to a healthy judicial respect. *See generally Bucks Cty. Servs., Inc. v. Phila. Parking Auth.*, 2018 WL 5046998, at *17, __ A.3d __ (Pa. 2018) (Wecht, J. concurring). Consider instead this idea of consigning or offloading to an administrative agency the power to tell us what a law means. The General Assembly tells us what a law is. When that law is

---

[7]     Kenneth W. Starr, Observations About the Use of Legislative History, 1987 DUKE L.J. 371, 375 (1987).

[8]     *See generally Commonwealth v. McClintic*, 909 A.2d 1241, 1245-46 (Pa. 2006) ("Consistent with the Statutory Construction Act, this Court has repeatedly recognized that rules of construction, such as consideration of a statute's perceived 'object' or 'purpose,' are to be resorted to only when there is an ambiguity in the meaning of the words.").

less than clear, we must perform our interpretive duty. In cases involving ambiguous statutory language, the interpretation suggested by an agency charged with administering the statute may be considered, but "the meaning of a statute is essentially a question of law for the court." *Phila. Suburban Corp. v. Cmwlth., Bd. of Fin. & Revenue*, 635 A.2d 116, 118 (Pa. 1993) (quoting *Girard Sch. Dist. v. Pittenger*, 392 A.2d 261, 263 (Pa. 1978)). Statutory interpretation is an important part of the work that we do. We do not subcontract that interpretive enterprise to administrative agencies.

Finally, I offer a word of caution with regard to the Majority's reliance on "policy." *See* Maj. Op. at 38-39. The only relevant policy-based concern entertained by a court engaging in statutory (as distinct from common law) construction is the policy evinced by the statute, established by the legislative branch of our government. It is a legislative function to establish policy, and a judicial function to find and then apply that policy, subject always to constitutional limitations. *Program Admin. Servs., Inc. v. Dauphin Cty. Gen. Auth.*, 928 A.2d 1013, 1017-18 (Pa. 2007); *see also Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009) ("[I]t is for the legislature to formulate the public policies of the Commonwealth.").[9]

In any event, though I would foreswear resort here to legislative history or agency-legal advice, I nonetheless arrive at the same destination as the Majority. A review of Act 13's provisions, in context, demonstrates that "any" means any one month. The PUC's

---

[9]  Certainly, in a critical yet confined area, this Court may, and indeed, must, espouse policy: to wit, the policy of Pennsylvania's unified judicial system and all of its constituent parts and aspects, as well as policies concerning the practice of law in this Commonwealth. These robust powers are enshrined in Article V of the Pennsylvania Constitution. In other respects, when it interprets statutes, the judiciary is not the policy-making branch of our Commonwealth's government.

interpretation was correct; the Commonwealth Court's was not. If this is not what the General Assembly meant by "any," then the General Assembly should amend Act 13. As always, it has the power to do so.

Justice Baer joins this concurring opinion.